UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>DAWNELL PARKER<br><br>              Defendant. | Case No. 23-cr-02192-TWR<br><br>I N F O R M A T I O N<br><br>Title 18 U.S.C., Sec. 371 – Conspiracy; Title 18, U.S.C., Secs. 981(a)(1)(C) and Title 28, U.S.C., Sec. 2461(c) – Criminal Forfeiture |

The United States Attorney charges, at all times material:

Introductory Allegations

1.  From approximately August 2009 through August 2019, Defendant DAWNELL PARKER was a civilian employee for the Department of Defense (DoD) working at the Naval Information Warfare Center (NIWC), previously known as the Space and Naval Warfare Systems Center (SPAWAR), in San Diego, California. NIWC was a command of the United States Navy, a branch of the United States Department of Defense ("DoD") which was a Department of the United States Government. PARKER was therefore a public official pursuant to 18 U.S.C. §201(a). At NIWC, PARKER's role was primarily administrative in nature. As part of her job position, PARKER assisted Contracting Officer

MLW: San Diego
10/24/23

Representatives ("CORs") at NIWC with administrative tasks relating to contract management. PARKER was not herself a certified DoD COR and was therefore not permitted to serve as a COR on DoD contracts.

2. As a DoD employee, PARKER's official duties included those found in Department of Defense Directive 5500.07-R (Joint Ethics Regulations); 5 C.F.R. Part 2635 (Standards of Ethical Conduct for Employees of the Executive Branch); 5 C.F.R. Part 3601 (Supplemental Standards of Ethical Conduct for Employees of the Department of Defense); and Executive Order 12674 (Principles of Ethical Conduct for Government Officers and Employees).

3. Co-Conspirator-X was an engineer and project lead at NIWC in San Diego, California, and was therefore also a public official pursuant to 18 U.S.C. §201(a). In his role at NIWC, Co-Conspirator-X had the ability to influence the award of defense contracts. Co-Conspirator-X was also certified as a DoD COR. As a COR, Co-Conspirator-X had the responsibility to approve contractor invoices, evaluate contractor bids and proposals, conduct contractor performance reviews, and oversee contractor performance among many other official duties.

4. In approximately 2015, PARKER transitioned to working directly with Co-Conspirator-X, supporting him in his duties at NIWC. In that role, PARKER worked under the direction of Co-Conspirator-X. PARKER worked with Co-Conspirator-X from 2015 until the time she left NIWC in August 2019.

5. The Program Support Center ("PSC") at Department of Health and Human Services ("HHS") provided acquisition services, including assisted acquisition services, to various government agencies,

including the DoD. In an assisted acquisition, one Government agency requests assistance in the procurement process from another agency. As part of the assisted acquisition process, PSC provided a contracting officer, and assisted with determining the correct contract vehicle to use for the acquisition. In carrying out its assisted acquisition services, PSC frequently delegated certain responsibilities for administering and monitoring its contracts to a COR.

6. There are various documents that are typically used in the Government contracting process, including the Request for Proposal ("RFP"), Statement of Work ("SOW") or Performance Work Statement ("PWS"), and Independent Government Cost Estimate ("IGCE") among other documents. The RFP, SOW, PWS, and IGCE are Government documents, that are supposed to be drafted by Government officials. Co-Conspirator-X purported to draft these documents for DoD commands that did contracting through him and PSC.

7. Contractor-A was a defense contractor headquartered in Fredericksburg, Virginia. Contractor-A was a participant in the Small Business Administration 8(a) program and was therefore eligible for certain types of sole source and direct award contracts. Co-Conspirator-A was the President and CEO of Contractor-A.

## Count One

### Conspiracy to Commit Bribery (18 U.S.C. § 371)

8. The allegations in Paragraphs 1-6 are hereby incorporated by reference as if fully set forth herein.

9. Beginning on or before March 31, 2016 and continuing up to and including October 29, 2019, within the Southern District of

California and elsewhere, DAWNELL PARKER agreed with Co-Conspirator-X, Co-Conspirator-A, Contractor-A and others to commit bribery. Specifically, PARKER, being a public official, agreed to, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept things of value, including expensive meals, in return for being influenced in the performance of official acts and being induced to do or omit to do acts in violation of her official duties, in violation of 18 U.S.C. §§ 201(b)(2)(A) and (C).

### Objects of the Conspiracy

10. It was an object of the conspiracy that Co-Conspirator-A would offer and give a stream of benefits to Co-Conspirator-X and DAWNELL PARKER. These included expensive dinners for PARKER and Co-Conspirator-X as well as tickets to premiere sporting events such as the World Series and the Super Bowl for Co-Conspirator-X.

11. It was a further object of the conspiracy that DAWNELL PARKER and Co-Conspirator-X would use their official positions to perform official acts; to exert pressure on other officials to perform official acts; and to advocate before and advise other officials, knowing and intending that such advocacy and advice would form the basis for their official acts; all to advance Contractor-A and Co-Conspirator-A's business interests, and specifically to steer Department of Defense contracts to Contractor-A, and to promote Contractor-A and Co-Conspirator-A's business interests as issues relating to Department of Defense contracts and contracting with Contractor-A were brought to PARKER and Co-Conspirator-X's and others' attention.

12. It was a further object of the conspiracy that DAWNELL PARKER and Co-Conspirator-X would do or omit to do acts in violation of their official duties, to advance Contractor-A and Co-Conspirator-A's business interests, specifically in relation to Department of Defense contracts.

### Manner and Means of the Conspiracy

13. In furtherance of this conspiracy, and to accomplish its objects, various conspirators at various times used the following manners and means, among others:

    a. Co-Conspirator-A and Contractor-A offered and gave a stream of benefits to DAWNELL PARKER and Co-Conspirator-X, including expensive meals for Co-Conspirator-X and DAWNELL PARKER and tickets to premiere sporting events such as the Super Bowl and the World Series for Co-Conspirator-X.

    b. Co-Conspirator-X and DAWNELL PARKER sought, accepted, and received these things of value from Contractor-A and Co-Conspirator-A.

    c. In return for this stream of benefits from Co-Conspirator-A and Contractor-A, DAWNELL PARKER and Co-Conspirator-X agreed to perform official acts; to exert pressure on other officials to perform official acts; and to advocate before and advise other officials, knowing and intending that such advocacy and advice would form the basis for their official acts; all to advance Contractor-A's Co-Conspirator-A's business interests with regards to Department of Defense contracts and contracting, as questions, matters, and controversies relating to that business was brought to DAWNELL PARKER's and Co-Conspirator-X's attention.

   d. Co-Conspirator-X and DAWNELL PARKER would use sole source contracting through the SBA 8(a) program, to steer Department of Defense contracts to Contractor-A or other defense contractors who purported to partner with Contractor-A.

   e. DAWNELL PARKER and Co-Conspirator-X would allow Co-Conspirator-A to draft documentation for procurements, including competitive procurements, before they were awarded, including such documents as the SOW, PWS, RFP, and the IGCE. As a result, Co-Conspirator-A was able to draft the requirements for the contract and set the price the Government expected to pay for the services under that contract.

   f. DAWNELL PARKER and Co-Conspirator-X would take additional steps to ensure Contractor-A was awarded Department of Defense contracts. DAWNELL PARKER and Co-Conspirator-X would sit on technical evaluation panels (TEPs) or technical evaluation boards (TEBs) and would ensure that Contractor-A received a high rating regarding their technical ability to do the contracted work. In competitive procurements, DAWNELL PARKER and Co-Conspirator-X would give Contractor-A's competitors lower ratings.

   g. Co-Conspirator-X would falsify TEP paperwork and claim individuals had technically evaluated proposals when they had not.

   h. DAWNELL PARKER served as the COR on contracts for Contractor-A, even though she was not a NIWC certified COR. DAWNELL PARKER put her name on Technical Evaluations of contracts for Contractor-A, that she did not, in fact evaluate.

   i. After contract award, DAWNELL PARKER approved invoices for Contractor-A, without verifying that the Government had received

the billed for services, and even though she was not a NIWC certified COR, thereby ensuring Contractor-A received payment on their contracts.

j. After contract award, Co-Conspirator-X also approved Contractor-A's invoices, thereby ensuring they received payment from the Government.

k. DAWNELL PARKER concealed from NIWC much of her contracting activity, including her work as a COR on contracts for Contractor-A.

l. Co-Conspirator-X concealed from NIWC much of his contracting activity, including his work as a COR on contracts for Contractor-A.

## OVERT ACTS

14. In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed:

a. On or about March 31, 2016, Co-Conspirator-A took Co-Conspirator-X and DAWNELL PARKER out to dinner at Ruth's Chris Steak House in Arlington, Virginia. Co-Conspirator-A spent $610.24 on the meal.

b. On or about April 4, 2016, DAWNELL PARKER, Co-Conspirator-X and others served as the evaluators as part of a Technical Evaluation for Contractor-A relating to a DoD contract. PARKER did so, despite the fact that she was not a certified COR and did not have the technical background to evaluate the contract. The following day PSC awarded Contractor-A an 8(a) Direct Award Contract with a total potential award value of approximately $991,489.78.

c. On or about June 16, 2016, Co-Conspirator-A took DAWNELL PARKER and Co-Conspirator-X to dinner at De Medici Cucina in San Diego, California.  Co-Conspirator-A paid $697.47 for the meal.

d. On or about July 27, 2016, PSC sent Co-Conspirator-X and PARKER an email regarding a proposed Navy contract, asking, "Can you please advise me of the acquisition strategy...? Did you have a vendor in mind?" Co-Conspirator-X replied to PSC and the Navy command, "The strategy is a 8 a direct to [Contractor 1]."

e. On or about August 23, 2016, PARKER informed PSC that she had reviewed Contractor-A's response to a solicitation and that Contractor-A's technical and cost proposals were acceptable.

f. On or about August 26, 2016, PARKER submitted a Consensus Technical Evaluation to PSC and a signed Conflict of Interest Statement for a solicitation responded to by Contractor-A. PARKER was the sole evaluator, and she rated Contractor-A's Overall Technical Approach as "Excellent."  Although only PARKER's name was on the document, it was partially drafted by Co-Conspirator-X. On or about September 9, 2016, PSC awarded Contractor-A the corresponding contract, worth approximately $2.1 million over five years.  PARKER was designated the Technical Point of Contact and the COR on the contract.

g. On or about September 6, 2016, PARKER submitted a Consensus Technical Evaluation and a signed Conflict of Interest Statement to PSC for another proposal by Contractor-A.  PARKER rated Contractor-A "Acceptable" in all regards, and claimed no weaknesses and no deficiencies.  PSC awarded Contractor-A the associated contract on September 20, 2016.

h. On or about January 10, 2017, Co-Conspirator-A took Co-Conspirator-X and DAWNELL PARKER, among others, to dinner at Ruth's Chris Steakhouse in Arlington, Virginia. Co-Conspirator-A paid $917.48 for the meal.

i. On or about February 15, 2017, DAWNELL PARKER submitted to PSC a Technical Evaluation document signed by Co-Conspirator-X, evaluating Contractor-A. On or about March 8, 2017, PSC awarded Contractor-A the associated modification to a contract in the amount of approximately $337,118.74.

j. On or about February 23, 2017, DAWNELL PARKER along with Co-Conspirator-X and others attended a luncheon meeting hosted by Co-Conspirator-A at the University Club in San Diego, California. Co-Conspirator-A spent $394.37 on the meal.

k. On or about April 20, 2017, DAWNELL PARKER sent PSC a PWS and IGCE for a task order on a Contractor-A contract on which PARKER was the designated COR. On or about May 17, 2017, PARKER followed up with PSC telling them that the task order "has to be awarded . . . ASAP, this week if poss[i]ble." On or about May 22, 2017, PSC ultimately awarded the task order, worth $105,489 to Contractor-A.

l. On or about September 7, 2017, DAWNELL PARKER submitted a Consensus Technical Evaluation Form and Conflict of Interest disclosure for a proposal by Contractor-A, rating Contractor-A as acceptable. PARKER served on the Technical Evaluation Panel with Co-Conspirator-X.

m. On or about September 12, 2017, DAWNELL PARKER had dinner with Co-Conspirator-A at Ruth's Chris in Crystal City, Virginia.

n. On or about February 1, 2018, Co-Conspirator-X emailed a DoD entity a Consensus Evaluation document for a proposal by Contractor-A. The document was drafted by Co-Conspirator-X and DAWNELL PARKER.

o. On or about February 7, 2018, Co-Conspirator-A took Co-Conspirator-X and others out to dinner at Bluewater Boathouse Grill in San Diego, California. Co-Conspirator-A paid $859.00 for dinner. DAWNELL PARKER was invited to attend by Co-Conspirator-A but did not attend this dinner because she had a headache.

p. On or about April 24, 2018, Co-Conspirator-A took Co-Conspirator-X and DAWNELL PARKER to dinner at Athena Pallas in Alexandria, Virginia. Co-Conspirator-A spent $208.96 on the meal.

q. On or about May 7, 2018, Co-Conspirator-A took Co-Conspirator-X and DAWNELL PARKER out to dinner at Fat Tuna Grill in Williamsburg, Virginia. Co-Conspirator-A paid $519.43 for the meal.

r. On or about May 16, 2018, PARKER requested that PSC set up an agency catalog on behalf of the Defense Intelligence Agency (DIA). After obtaining information regarding how to set up the catalog, PARKER forwarded the information to Co-Conspirator-A.

s. On or about June 19, 2018, Co-Conspirator-A provided PARKER with the materials requested by PSC to start the DIA agency catalog, via email, including draft catalog entries and "the draft SOW for the work[.]"

t. On or about July 9, 2018, Co-Conspirator-X submitted a Consensus Technical Evaluation for Contractor-A for a competitive 8(a) Multiple Award Contract ("MAC"), to PSC. Co-Conspirator-X signed the document which rated Contractor-A "Excellent" on all categories. Co-Conspirator-X additionally signed a Team Technical Summary document for all of the offerors on the solicitation. Both the Consensus Technical Evaluation and the Team Technical Summary Document indicated that DAWNELL PARKER had served on the technical evaluation panel for the contracting effort. Both documents also falsely claimed that a fellow SPAWAR employee had participated in the technical evaluation of the proposals. On or about August 23, 2018, PSC ultimately awarded the 8(a) MAC to all six offerors, including Contractor-A.

u. On or about July 19, 2018, DAWNELL PARKER notified PSC of a new possible 8(a) direct award to Contractor-A to support the Navy and attached a PWS and IGCE. Co-Conspirator-X followed up and confirmed, "Yes, direct award to [Contractor-A]."

v. On or about July 23, 2018, DAWNELL PARKER submitted to PSC a PWS and IGCE that had been drafted by Co-Conspirator-A and another defense contractor for a new 8(a) Cyber IDIQ contract.

w. On or about August 17, 2018, DAWNELL PARKER forwarded government contract documents that she had received from DIA for the potential agency catalog to Co-Conspirator-A, including a draft SOW and IGCE.

x. On or about August 31, 2018, Co-Conspirator-X submitted a technical evaluation to PSC for Contractor-A as part of the 8(a) Cyber IDIQ Contract. DAWNELL PARKER and Co-Conspirator-X

were both listed as evaluators and they gave Contractor-A "Excellent" ratings in all categories. On or about September 4, 2018, PSC awarded the 8(a) Cyber IDIQ contract to Contractor-A, worth approximately $4,000,000.

      y. On or about October 28, 2018 Co-Conspirator-X and his wife attended Game 5 of the World Series between the Boston Red Sox and Los Angeles Dodgers at Dodger Stadium in Los Angeles, California with Co-Conspirator-A. Co-Conspirator-A purchased the three field-level box seats for approximately $7,161 and parking passes for approximately $315.98.

      z. On or about November 13, 2018, Co-Conspirator-A took Co-Conspirator-X and DAWNELL PARKER to dinner at Clyde's of Gallery Place in Washington, D.C. Co-Conspirator-A spent $396.58 on the meal. That same evening, Co-Conspirator-A sent Co-Conspirator-X an email to Co-Conspirator-X's personal email account with "some possible discriminators to use for [Commander Undersea Surveillance]" and a list of limitations to include for an upcoming contract solicitation.

      aa. On or about January 4, 2019, PSC emailed Co-Conspirator-X asking questions regarding the IGCE for a direct award to Contractor-A. Co-Conspirator-X forwarded that email to Co-Conspirator-A. In response, on or about January 10, 2019, Co-Conspirator-A emailed Co-Conspirator-X a PWS and IGCE for the effort, noting that "the IGCE has been adjusted to show the hourly labor category rate" and providing information to Co-Conspirator-X regarding other rates in the IGCE. The metadata for the attached IGCE reflected that the author of the IGCE was Co-Conspirator-A and that the document was last modified by Co-Conspirator-A on or about

January 8, 2019. The attached PWS, similarly reflected that it was last modified by Co-Conspirator-A on or about December 6, 2018.

bb. On or about January 18, 2019, DAWNELL PARKER sent the PWS and IGCE, as modified by Co-Conspirator-A, to PSC, stating, "Attached are the correct PWS and IGCE for this requirement."

cc. On or about January 24, 2019, PSC sent Co-Conspirator-A the official solicitation for the project. On January 25, 2019, Co-Conspirator-A sent Contractor-A's response to the official solicitation to PSC, cc'ing Co-Conspirator-X and DAWNELL PARKER. Contractor-A's proposal was approximately $955 lower than the IGCE for the project, and just below the $4 million limit for SBA 8(a) direct award contracting.

dd. On or about January 31, 2019, Co-Conspirator-A directed DAWNELL PARKER to set up a "new IDIQ contract at the $4 million ceiling."

ee. On or about February 3, 2019, Co-Conspirator-X attended Super Bowl LIII with Co-Conspirator-A in Atlanta, Georgia. Co-Conspirator-A paid approximately $10,900 for the tickets.

ff. On or about February 4, 2019, DAWNELL PARKER sent an email to two civilian employees of Commander, Fleet Readiness Center Southwest. In that email, PARKER wrote, "While [Co-Conspirator-X] is on vacation I am helping to cover his work load. Attached is the PWS with a few questions that need to be addressed. The Contract Specialist is requiring the [Other Direct Costs] line listed on the IGCE be broken out." PARKER attached the PWS and IGCE to the email. Co-Conspirator-X forwarded the email, including the PWS and IGCE to Co-Conspirator-A.

gg.  On or about February 19, 2019, PSC sent Co-Conspirator-X four technical proposals for the first competitive 8(a) MAC task order, for him to evaluate.  The competing defense contractors included Contractor-A and three other defense contractors on the 8(a) MAC.  On or about March 11, 2019, Co-Conspirator-X sent back the completed technical evaluations of all four defense contractors.  The evaluators for the defense contractors were Co-Conspirator-X, DAWNELL PARKER and another individual.  Contractor-A received an overall "Excellent" evaluation.  The other three defense contractors received "Poor" evaluations.

hh.  On or about February 19, 2019, after PSC asked whether Co-Conspirator-X and DAWNELL PARKER had received a PWS or IGCE for a new contracting requirement, DAWNELL PARKER forwarded the email to Co-Conspirator-A, asking, "Hi [Co-Conspirator-A], I need a PWS and IGCE for this one."

ii.  On or about February 20, 2019, Co-Conspirator-A sent Co-Conspirator-X and DAWNELL PARKER an email attaching a PWS and IGCE.  In the email, Co-Conspirator-A asked, "Can we please set this up as a net-new 8(a) direct award with HHS?"

jj.  On or about March 4, 2019, DAWNELL PARKER sent PSC a PWS and IGCE attached to an email stating, "[a]ttached are the documents for a new 8a Direct award contract."  A contractor at PSC replied, "Did you have an 8(a) in mind?"  Co-Conspirator-X responded, "[Contractor-A]."

kk.  On or about March 27, 2019, Co-Conspirator-X emailed PSC the Consensus Technical Evaluations for the second task order on the 8(a) MAC.  Three defense contractors proposed on the

competitive task order, including Contractor-A. Co-Conspirator-X signed each evaluation as the "TEP Chair." The evaluations gave Contractor-A the highest rating for their proposal. The forms reflected that Co-Conspirator-X, DAWNELL PARKER and another DoD employee, who was not involved in the evaluation process, and who was unaware that his name was being used in this manner, had also evaluated the proposals.

ll. On or about April 4, 2019, DAWNELL PARKER emailed PSC as the assigned COR on a contract with Contractor-A indicating that the Government wished to exercise the option year. The option year was worth approximately $193,286.40.

mm. On or about April 8, 2019, DAWNELL PARKER emailed Co-Conspirator-X and Co-Conspirator-A with the text "Please send an IGCE." That same day, Co-Conspirator-A wrote back, attaching the requested IGCE for a contracting effort.

nn. On or about April 22, 2019, DAWNELL PARKER emailed Co-Conspirator-A and asked him to update an IGCE and to answer questions that PSC had regarding a particular contracting effort.

oo. On or about April 28, 2019, Co-Conspirator-A wrote back sending an updated IGCE for the effort. On or about May 1, 2019, DAWNELL PARKER confirmed to Co-Conspirator-A that she had sent the updated IGCE to PSC.

pp. On or about May 14, 2019, Co-Conspirator-A emailed Co-Conspirator-X and DAWNELL PARKER attaching a PWS and IGCE for a contracting effort. In the email, Co-Conspirator-A wrote, "Can you please review the SOW and send [PSC] this new SOW and IGCE and ask [PSC] to re-submit the 8(a) offer letter using the correct NAICS

Code 541519 (Except IT VAR), which has a size standard of 150 employees."

All in violation of Title 18, United States Code, Section 371.

## Forfeiture Allegations

15. The allegations set forth above are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

16. Upon conviction of the offense of conspiracy to commit bribery as set forth in Count One, defendant DAWNELL PARKER, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to: A forfeiture money judgment in that amount of proceeds Defendant personally received from the offense in an amount not less than $5,000.

17. If any of the above-described forfeited property, as result of any act or omission of defendant DAWNELL PARKER:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be separated without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable herein by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of defendant DAWNELL PARKER up to the value of the said property described above as being subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

DATED:   10/24/23  .

                                                  TARA K. MCGRATH
                                                United States Attorney

                                By: _____

                                                MICHELLE L. WASSERMAN
                                                Assistant U.S. Attorney