1 | TARA K. MCGRATH
United States Attorney
2 | MICHELLE L. WASSERMAN
Assistant United States Attorney
3 | California Bar No. 254686
Federal Office Building
4 | 880 Front Street, Room 6293
San Diego, California 92101-8893
5 | Telephone: (619) 546-8431
Email: michelle.wasserman@usdoj.gov
6 |
Attorneys for United States of America
7 |



FILED

OCT 2 6 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

8 | **UNITED STATES DISTRICT COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10 | UNITED STATES OF AMERICA,

11 |       Plaintiff,

12 |     v.

13 | DAWNELL PARKER,

14 |       Defendant.

Case No.  23-cr-02192-TWR

PLEA AGREEMENT

15     IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF

16 AMERICA, through its counsel, TARA K. MCGRATH, United States Attorney,

17 and Michelle L. Wasserman, Assistant United States Attorney, and

18 Defendant DAWNELL PARKER, with the advice and consent of David Baker,

19 counsel for Defendant, as follows:

20                       I

21              **THE PLEA**

22     A. The Charge

23     Defendant agrees to waive Indictment and plead guilty to an

24 Information charging Defendant with conspiracy to commit bribery in

25 violation of 18 U.S.C. § 371.

26     B. Prosecution Of Additional Counts

27     In exchange for the defendant's plea of guilty, the United States

28 agrees not to prosecute any additional criminal charges against the

Plea Agreement

Def. Initials 

1  defendant based on information now known to the United States related
2  to bribery.  Nothing in this agreement, however, shields the defendant
3  from prosecution for any act or omission not now known to the United
4  States or committed after the date of this agreement.  The United States
5  remains free to prosecute the defendant for perjury, false statements,
6  or obstruction of justice if the defendant commits such an offense after
7  the defendant signs this plea agreement.  Should the defendant commit
8  perjury, give false statement, or commit obstruction of justice, the
9  United States, at its sole discretion, will be free to prosecute the
10  defendant for that offense, move to set aside this plea agreement,
11  and/or be relieved of its obligations under this agreement.

12                                    II

13                      **NATURE OF THE OFFENSE**

14      A.   ELEMENTS EXPLAINED

15      The offense to which Defendant is pleading guilty has the following
16  elements:

              1. There was an agreement between two or more persons to
17                 commit the crime of bribery, in violation of Title 18,
18                 United States Code, Section 201;

19            2. Defendant became a member of the conspiracy knowing of at
20                 least one of its objects and intending to help accomplish
21                 it; and

              3. One of the members of the conspiracy performed at least
22                 one  overt  act  for  the  purpose  of  carrying  out  the
23                 conspiracy.

24      B. ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS

25      Defendant has fully discussed the facts of this case with counsel.
26  Defendant committed each of the elements of the crime and admits that
27  there is a factual basis for this guilty plea. The following facts are

28                                                          Def. Initials DP

true and undisputed and had this case gone to trial, the United States would have presented evidence to prove them beyond a reasonable doubt:

1.  From approximately August 2009 through August 2019 Defendant DAWNELL PARKER worked at the Naval Information Warfare Center (NIWC), previously known as the Space and Naval Warfare Systems Center (SPAWAR), in San Diego, California. NIWC was a command of the United States Navy, a branch of the United States Department of Defense ("DoD"), which was a Department of the United States Government. In this capacity, DAWNELL PARKER was a public official, as defined in 18 U.S.C. 201(a)(1). DAWNELL PARKER's official role at NIWC was primarily administrative in nature. As part of her job position at NIWC, PARKER assisted Contracting Officer Representatives ("CORs") at NIWC with administrative tasks relating to contract management. PARKER's educational background included high school and some college.

2.  As a DoD employee, PARKER's official duties included those found in Department of Defense Directive 5500.07-R (Joint Ethics Regulations); 5 C.F.R. Part 2635 (Standards of Ethical Conduct for Employees of the Executive Branch); 5 C.F.R. Part 3601 (Supplemental Standards of Ethical Conduct for Employees of the Department of Defense); and Executive Order 12674 (Principles of Ethical Conduct for Government Officers and Employees).

Def. Initials

3.   Co-Conspirator-X also worked as an employee at NIWC, in San Diego, California.   In this capacity, Co-Conspirator-X was also a public official, as defined in 18 U.S.C. 201(a)(1).   In his role at NIWC, Co-Conspirator-X had the ability to influence the award of defense contracts.   Co-Conspirator-X was certified as a COR.   As a COR, Co-Conspirator-X had the responsibility to approve contractor invoices, evaluate contractor bids and proposals, conduct contractor performance reviews, and oversee contractor performance among other official duties.

4.   In approximately 2015, PARKER transitioned to working directly with Co-Conspirator-X, supporting him in his duties at NIWC.   In that role, PARKER worked under the direction of Co-Conspirator-X.

5.   DAWNELL PARKER was not a certified NIWC COR, and therefore was not permitted to fulfill COR duties on Department of Defense contracts.   Nonetheless, over the relevant time period and as part of the conspiracy, DAWNELL PARKER fulfilled COR duties on contracts for the Department of Defense, without the knowledge of NIWC, including approving contractor invoices, evaluating the technical merits of contractor bids and proposals, and overseeing contractor performance on contracts with DoD entities.

6.   The Program Support Center ("PSC") at Department of Health and Human Services ("HHS") provided acquisition

4

Def. Initials

services, including assisted acquisition services, to various government agencies, including the DoD. In an assisted acquisition, one Government agency requests assistance in the procurement process from another agency. As part of the assisted acquisition process, PSC provided a contracting officer, and assisted with determining the correct contract vehicle to use for the acquisition. In carrying out its assisted acquisition services, PSC frequently delegated certain responsibilities for administering and monitoring its contracts to a COR.

7.   There are various documents typically used in the Government contracting process, including the Request for Proposal ("RFP"), Statement of Work ("SOW") or Performance Work Statement ("PWS"), and Independent Government Cost Estimate ("IGCE") among other documents. The RFP, SOW, PWS, and IGCE are Government documents, that are supposed to be drafted by Government officials. Co-Conspirator-X purported to draft these documents for the various DoD commands who did contracting through him and PSC. PARKER was also sometimes involved in the drafting of procurement documents.

8.   Contractor-A was a defense contractor headquartered in Fredericksburg, Virginia. Contractor-A was a participant in the Small Business Administration 8(a) program and was therefore eligible for certain types of

5

Def. Initials DP

1  sole source and direct award contracts. Co-Conspirator-
2  A was the President and CEO of Contractor-A.

3  *The Conspiracy*

4  9.  Beginning on or before March 31, 2016, and continuing
5      through at least October 29, 2019, PARKER agreed with
6      Co-Conspirator-X, Co-Conspirator-A, Contractor-A and
7      others to commit bribery. Specifically, PARKER, being
8      a public official, agreed to, directly and indirectly,
9      corruptly demand, seek, receive, accept, and agree to
10     receive and accept things of value, including expensive
11     meals, in return for being influenced in the performance
12     of official acts and being induced to do or omit to do
13     acts in violation of her official duties.

14  10. As part of the conspiracy, Co-Conspirator-A and
15      Contractor-A gave DAWNELL PARKER and Co-Conspirator-X
16      things of value, including expensive dinners. In return
17      for the stream of benefits from Co-Conspirator-A and
18      Contractor-A, DAWNELL PARKER and Co-Conspirator-X were
19      influenced in the performance of official acts, exerted
20      pressure on other officials to perform official acts;
21      and advocated before and advised other officials,
22      knowing and intending that such advocacy and advice
23      would form the basis for their official acts; all to
24      advance Contractor-A and Co-Conspirator-A's business
25      interests with regards to Department of Defense
26      contracts and contracting, as questions, matters, and
27      controversies relating to that business were brought to

28

Def. Initials _____

Co-Conspirator-X's and PARKER's attention. In addition, PARKER and Co-Conspirator-X were induced to do or omit to do acts in violation of their official duties.

11. Specifically, as part of the conspiracy, PARKER served as the COR on contracts for Contractor-A, even though she was not a NIWC certified COR.  PARKER put her name on Technical Evaluations of contracts for Contractor-A, that she did not, in fact, evaluate.  As a further part of the conspiracy, PARKER approved invoices for Contractor-A, without verifying that the Government had received the billed for services, and even though she was not a NIWC certified COR, thereby ensuring Contractor-A received payment on its contracts.  PARKER and Co-Conspirator-X used sole source contracting through the SBA 8(a) program, to steer Department of Defense contracts to Contractor-A or other defense contractors who purported to partner with Contractor-A. PARKER and Co-Conspirator-X additionally allowed Co-Conspirator-A to draft Government documents including the PWS, SOW, RFP, and IGCE for contracting efforts, including competitive contracting efforts, before the contracts were awarded. As a result, Co-Conspirator-A was able to draft the requirements for the contract, set the price the Government expected to pay for the services under that contract, and later bid below that expected price to win the contract.  As a result of the

conspiracy, Contractor-A was awarded millions of dollars in Government contracts.

12.   During the course of the conspiracy, PARKER, Co-Conspirator-X, Co-Conspirator-A and others took numerous overt acts in furtherance of the conspiracy.

13.   On March 31, 2016, Co-Conspirator-A took Co-Conspirator-X and PARKER out to dinner at Ruth's Chris Steak House in Arlington, Virginia.  Co-Conspirator-A spent $610.24 on the meal.

14.   On April 4, 2016, PARKER, Co-Conspirator-X and others served as the evaluators as part of a Technical Evaluation for Contractor-A relating to a DoD contract. PARKER did so, despite the fact that she was not a certified COR and did not have the technical background to evaluate the contract.  The following day PSC awarded Contractor-A an 8(a) Direct Award Contract with a total potential award value of approximately $991,489.78.

15.   On June 16, 2016, Co-Conspirator-A took PARKER and Co-Conspirator-X to dinner at De Medici Cucina in San Diego, California.  Co-Conspirator-A paid $697.47 for the meal.

16.   On July 27, 2016, PSC sent Co-Conspirator-X and PARKER an email regarding a proposed Navy contract, asking, "Can you please advise me of the acquisition strategy...? Did you have a vendor in mind ?" Co-Conspirator-X replied to PSC and the Navy command, "The strategy is a 8 a direct to Contractor 1."

Def. Initials DP

17. On August 23, 2016, PARKER informed PSC that she had reviewed Contractor-A's response to a solicitation and that Contractor-A's technical and cost proposals were acceptable.

18. On August 26, 2016, PARKER submitted a Consensus Technical Evaluation to PSC and a signed Conflict of Interest Statement for a solicitation responded to by Contractor-A. On or about August 30, 2016, PARKER submitted the final evaluation. PARKER was the sole evaluator, and she rated Contractor-A's Overall Technical Approach as "Excellent." Although only PARKER's name was on the document, it was partially drafted by Co-Conspirator-X. On or about September 9, 2016, PSC awarded Contractor-A the corresponding contract, worth approximately $2.1 million over five years. PARKER was designated the Technical Point of Contact and the COR on the contract.

19. On September 6, 2016, PARKER submitted a Consensus Technical Evaluation and a signed Conflict of Interest Statement to PSC for another proposal by Contractor-A. PARKER rated Contractor-A "Acceptable" in all regards, and claimed no weaknesses and no deficiencies. PSC awarded Contractor-A the associated contract on September 20, 2016.

20. On January 10, 2017, Co-Conspirator-A took Co-Conspirator-X and PARKER, among others, to dinner at

Def. Initials

Ruth's Chris Steakhouse in Arlington, Virginia. Co-Conspirator-A paid $917.48 for the meal.

21. On February 15, 2017, DAWNELL PARKER submitted to PSC a Technical Evaluation document signed by Co-Conspirator-X, evaluating Contractor-A. On or about March 8, 2017, PSC awarded Contractor-A the associated modification to a contract in the amount of approximately $337,118.74.

22. On February 23, 2017, PARKER along with Co-Conspirator-X and others attended a luncheon meeting hosted by Co-Conspirator-A at the University Club in San Diego, California. Co-Conspirator-A spent $394.37 on the meal.

23. On April 20, 2017, PARKER sent PSC a PWS and IGCE for a task order on a Contractor-A contract on which PARKER was the designated COR. On or about May 17, 2017, PARKER followed up with PSC telling them that the task order "has to be awarded . . . ASAP, this week if poss[i]ble." On May 22, 2017, PSC ultimately awarded the modification to the contract, worth approximately $105,489 to Contractor-A.

24. On September 7, 2017, PARKER submitted a Consensus Technical Evaluation Form and Conflict of Interest disclosure for a proposal by Contractor-A, rating Contractor-A as acceptable. PARKER served on the Technical Evaluation Panel with Co-Conspirator-X.

25. On September 12, 2017, PARKER had dinner with Co-Conspirator-A at Ruth's Chris in Crystal City, Virginia.

Def. Initials

26. On or about February 1, 2018, Co-Conspirator-X emailed a DoD entity a Consensus Evaluation document for a proposal by Contractor-A. The document was drafted by Co-Conspirator-X and PARKER.

27. On February 7, 2018, Co-Conspirator-A took Co-Conspirator-X and others out to dinner at Bluewater Boathouse Grill in San Diego, California. Co-Conspirator-A paid $859.00 for dinner. PARKER was invited to attend by Co-Conspirator-A but did not attend this dinner because she had a headache.

28. On April 24, 2018, Co-Conspirator-A took Co-Conspirator-X and PARKER to dinner at Athena Pallas in Alexandria, Virginia. Co-Conspirator-A spent $208.96 on the meal.

29. On May 7, 2018, Co-Conspirator-A took Co-Conspirator-X and PARKER out to dinner at Fat Tuna Grill in Williamsburg, Virginia. Co-Conspirator-A paid $519.43 for the meal.

30. On May 16, 2018, PARKER requested that PSC set up an agency catalog on behalf of the Defense Intelligence Agency (DIA). After obtaining information regarding how to set up the catalog, PARKER forwarded the information to Co-Conspirator-A.

31. On June 19, 2018, Co-Conspirator-A provided PARKER with the materials requested by PSC to start the DIA agency catalog, via email, including draft catalog entries and, according to Co-Conspirator-A, "the draft SOW for the work[.]"

Def. Initials DP

32.  On July 9, 2018, Co-Conspirator-X submitted a Consensus Technical Evaluation for Contractor-A for a competitive 8(a) Multiple Award Contract ("MAC"), to PSC. Co-Conspirator-X signed the document which rated Contractor-A "Excellent" on all categories. Co-Conspirator-X additionally signed a Team Technical Summary document for all of the offerors on the solicitation. Both the Consensus Technical Evaluation and the Team Technical Summary Document indicated that PARKER had served on the technical evaluation panel for the contracting effort. Both documents also falsely claimed that a fellow SPAWAR employee had participated in the technical evaluation of the proposals. On or about August 23, 2018, PSC ultimately awarded the 8(a) MAC to all six offerors, including Contractor-A.

33.  On July 19, 2018, PARKER notified PSC of a new possible 8(a) direct award to Contractor-A to support the Navy and attached a PWS and IGCE. Co-Conspirator-X followed up and confirmed, "Yes, direct award to [Contractor-A]."

34.  On July 23, 2018, PARKER submitted to PSC a PWS and IGCE that had been drafted by Co-Conspirator-A and another defense contractor for a new 8(a) Cyber IDIQ contract.

35.  On August 1, 2018, PARKER forwarded government contract documents that she had received from DIA for the potential agency catalog to Co-Conspirator-A, including a draft SOW and IGCE.

Def. Initials DP

36. On August 31, 2018, Co-Conspirator-X submitted a technical evaluation to PSC for Contractor-A as part of the 8(a) Cyber IDIQ Contract. PARKER and Co-Conspirator-X were both listed as evaluators and they gave Contractor-A "Excellent" ratings in all categories. On or about September 4, 2018, PSC awarded the 8(a) Cyber IDIQ contract to Contractor-A, worth approximately $4,000,000.

37. On November 13, 2018, Co-Conspirator-A took Co-Conspirator-X and DAWNELL PARKER to dinner at Clyde's of Gallery Place in Washington, D.C. Co-Conspirator-A spent $396.58 on the meal. That same evening, Co-Conspirator-A sent Co-Conspirator-X an email to Co-Conspirator-X's personal email account with "some possible discriminators to use for [Commander Undersea Surveillance]" and a list of limitations to include for an upcoming contract solicitation.

38. On January 4, 2019, PSC emailed Co-Conspirator-X asking questions regarding the IGCE for a direct award to Contractor-A. Co-Conspirator-X forwarded that email to Co-Conspirator-A. In response, on January 10, 2019, Co-Conspirator-A emailed Co-Conspirator-X a PWS and IGCE for the effort, noting that "the IGCE has been adjusted to show the hourly labor category rate" and providing information to Co-Conspirator-X regarding other rates in the IGCE. The metadata for the attached IGCE reflected that the author of the IGCE was Co-Conspirator-A and

Def. Initials DP

that the document was last modified by Co-Conspirator-A on January 8, 2019.  The attached PWS similarly reflected that it was last modified by Co-Conspirator-A on December 6, 2018.

39.  On January 18, 2019, PARKER sent the PWS and IGCE, as modified by Co-Conspirator-A, to PSC, stating, "Attached are the correct PWS and IGCE for this requirement."

40.  On January 24, 2019, PSC sent Co-Conspirator-A the official solicitation for the project.  On January 25, 2019, Co-Conspirator-A sent Contractor-A's response to the official solicitation to PSC, cc'ing Co-Conspirator-X and PARKER.  Contractor-A's proposal was approximately $955 lower than the IGCE for the project, and just below the $4 million limit for SBA 8(a) direct award contracting.

41.  On January 31, 2019, Co-Conspirator-A directed DAWNELL PARKER to set up a "new . . .IDIQ contract at the $4 million ceiling."

42.  On February 4, 2019, DAWNELL PARKER sent an email to two civilian employees of Commander, Fleet Readiness Center Southwest.  In that email, PARKER wrote, "While [Co-Conspirator-X] is on vacation I am helping to cover his work load.  Attached is the PWS with a few questions that need to be addressed.  The Contract Specialist is requiring the [Other Direct Costs] line listed on the IGCE be broken out."  PARKER attached the PWS and IGCE

Def. Initials

1    to the email.  Co-Conspirator-X forwarded the email,
2    including the PWS and IGCE to Co-Conspirator-A.

3    43.   On February 19, 2019, PSC sent Co-Conspirator-X four
4          technical proposals for the first competitive 8(a) MAC
5          task order for him to evaluate.  The competing defense
6          contractors included Contractor-A and three other
7          defense contractors on the 8(a) MAC.  On or about March
8          11, 2019, Co-Conspirator-X sent back the completed
9          technical evaluations of all four defense contractors.
10         The evaluators for the defense contractors were Co-
11         Conspirator-X,   PARKER   and   another   individual.
12         Contractor-A received an overall "Excellent" evaluation.
13         The other three defense contractors received "Poor"
14         evaluations.

15   44.   On February 19, 2019, after PSC asked whether Co-
16         Conspirator-X and PARKER had received a PWS or IGCE for
17         a new contracting requirement, PARKER forwarded the
18         email to Co-Conspirator-A, asking, "Hi [Co-Conspirator-
19         A], I need a PWS and IGCE for this one."

20   45.   On February 20, 2019, Co-Conspirator-A sent Co-
21         Conspirator-X and PARKER an email attaching a PWS and
22         IGCE.  In the email, Co-Conspirator-A asked, "Can we
23         please set this up as a net-new 8(a) direct award with
24         HHS?"

25   46.   On March 4, 2019, PARKER sent PSC a PWS and IGCE attached
26         to an email stating, "[a]ttached are the documents for
27         a new 8a Direct award contract."  A contractor at PSC

28

                                  15

                                       Def. Initials DP

1    replied, "Did you have an 8(a) in mind?" Co-Conspirator-

2    X responded, "[Contractor-A]."

3    47.   On March 27, 2019, Co-Conspirator-X emailed PSC the

4    Consensus Technical Evaluations for the second task

5    order on the 8(a) MAC.   Three defense contractors

6    proposed on the competitive task order, including

7    Contractor-A.   Co-Conspirator-X signed each evaluation

8    as the "TEP Chair."   The evaluations gave Contractor-A

9    the highest rating for their proposal.   The forms

10   reflected that Co-Conspirator-X, PARKER and another DoD

11   employee, who was not involved in the evaluation

12   process, and who was unaware that his name was being

13   used in this manner, had also evaluated the proposals.

14   48.   On April 4, 2019, PARKER emailed PSC as the assigned COR

15   on a contract with Contractor-A indicating that the

16   Government wished to exercise the option year.   The

17   option year was worth approximately $193,286.40.

18   49.   On April 8, 2019, PARKER emailed Co-Conspirator-X and

19   Co-Conspirator-A with the text "Please send an IGCE."

20   That same day, Co-Conspirator-A wrote back, attaching

21   the requested IGCE for a contracting effort.

22   50.   On April 22, 2019, PARKER emailed Co-Conspirator-A and

23   asked him to update an IGCE and to answer questions that

24   PSC had regarding a particular contracting effort.   On

25   April 28, 2019, Co-Conspirator-A wrote back sending an

26   updated IGCE for the effort.   On May 1, 2019, PARKER

27

28

Def. Initials

1   confirmed to Co-Conspirator-A that she had sent the
2   updated IGCE to PSC.

3   51.   On May 14, 2019, Co-Conspirator-A emailed Co-
4         Conspirator-X and PARKER attaching a PWS and IGCE for a
5         contracting effort.   In the email, Co-Conspirator-A
6         wrote, "Can you please review the SOW and send [PSC]
7         this new SOW and IGCE and ask [PSC] to re-submit the
8         8(a) offer letter using the correct NAICS Code 541519
9         (Except IT VAR), which has a size standard of 150
10        employees."

11  52.   The total value of the bribes paid to PARKER by Co-
12        Conspirator-A and Contractor-A was less than $6,500.

13  C. Other Relevant Conduct

14       The parties agree that the following facts, which are true and
15  undisputed, will be considered by the Court at sentencing as other
16  relevant conduct pursuant to USSG § 1B1.3

17  1.    Contractor-B was a defense contractor with offices in
18        San Diego, California and Stafford, Virginia.   Co-
19        Conspirator-B ran Contractor-B's day to day operations.

20  2.    Beginning no earlier than 2015 and continuing up to at
21        least October 2019, DAWNELL PARKER agreed with Co-
22        Conspirator-X, Co-Conspirator-B, Contractor-B and
23        others to commit bribery.   Specifically, PARKER being a
24        public official, agreed to, directly and indirectly,
25        corruptly demand, seek, receive, accept, and agree to
26        receive and accept things of value in return for being
27        influenced in the performance of official acts and being

28

17

Def. Initials DP

1   induced to do or omit to do acts in violation of her

2   official duties.

3.   As part of the conspiracy, Co-Conspirator-B and Contractor-B gave DAWNELL PARKER and Co-Conspirator-X things of value, including meals and jobs for Co-Conspirator-X's family and friends. In return for the stream of benefits from Co-Conspirator-B and Contractor-B, DAWNELL PARKER and Co-Conspirator-X were influenced in the performance of official acts, exerted pressure on other officials to perform official acts; and advocated before and advised other officials, knowing and intending that such advocacy and advice would form the basis for their official acts; all to advance Contractor-B and Co-Conspirator-B's business interests with regards to Department of Defense contracts and contracting, as questions, matters, and controversies relating to that business were brought to Co-Conspirator-X's and PARKER's attention. In addition, PARKER and Co-Conspirator-X were induced to do or omit to do acts in violation of their official duties.

4.   Specifically, as part of the conspiracy, Co-Conspirator-B and employees of Contractor-B gave Co-Conspirator-X and PARKER things of value. In addition, Co-Conspirator-B gave Co-Conspirator-X's wife a job working at Contractor-B at Co-Conspirator-X's request. Co-Conspirator-B tried to hide the fact that Co-Conspirator-X's wife was working at Contractor-B by

Def. Initials DP

1       paying her through other businesses either owned or
2       controlled by Co-Conspirator-B.

3    5.  As part of the conspiracy, Co-Conspirator-B founded
4       small businesses including businesses that purported to
5       be Native Hawaiian SBA 8(a) businesses. Co-Conspirator-
6       B used these small businesses to win contracts that
7       Contractor-B was not eligible to win.   The small
8       businesses would then subcontract out all or most of the
9       work to Contractor-B.

10   6.  In order to further hide the connection between
11      Contractor-B and Co-Conspirator-X, PARKER agreed to
12      serve as the COR on numerous contracts that were either
13      directly with Contractor-B or were with the 8(a) front
14      companies controlled by Co-Conspirator-B that then
15      subcontracted out the work to Contractor-B.   DAWNELL
16      PARKER did so even though she was not a NIWC certified
17      COR and therefore was not allowed to serve as the COR on
18      DoD contracts.

19   7.  During the course of the conspiracy, PARKER, Co-
20      Conspirator-X, Co-Conspirator-B, Contractor-B and
21      others took numerous overt acts in furtherance of the
22      conspiracy.

23   8.  On September 27, 2016, Co-Conspirator-B took DAWNELL
24      PARKER, Co-Conspirator-X and others to dinner at
25      Season's 52 in San Diego, California. Co-Conspirator-B
26      paid $524.74 for the meal.

27

28

Def. Initials

9.  On December 16, 2016, Co-Conspirator-X, PARKER, an employee of Contractor-B and another individual had a meeting about contracts for Contractor-B. At the meeting the parties agreed, "SPAWAR through HHS will create & award a 3.85M GSA 8a STARS II Direct Award contract for Services to [Contractor-B]" and "SPAWAR through HHS will create & award a 50M Competitive Award contract for Services to [Contractor-B]" among other agreements.

10. On January 3, 2017, Co-Conspirator-X's wife started working at Contractor-B as a receptionist.

11. On March 29, 2017, PARKER attended a "kick off" meeting for a contracting effort hosted by Contractor-B. Contractor-B hosted lunch which came from Hane Sushi in San Diego, California and cost $852.08.

12. On December 27, 2017, PARKER served with Co-Conspirator 1 and one other individual on a TEP evaluating a competitive procurement on which Contractor-B was a bidder. The TEP rated Contractor-B "Excellent" and the other two bidders "Poor." On or about December 28, 2017, PSC awarded Contractor-B the contract, worth approximately $47 million. One of the losing bidders ultimately protested this contract, and the procurement was subsequently cancelled.

13. On March 20, 2018, PARKER emailed PSC asking about the status of a $50 million award to Contractor-B-1, a Native

Def. Initials DP

1    Hawaiian SBA 8(a) business started by Co-Conspirator-B,

2    and 49% owned at the time by Co-Conspirator-B's mother.

3  14. On May 25, 2018, PARKER emailed PSC stating, "Attached

4    are the PWS and IGCE to start a new contract. If at all

5    possible, we need to get this awarded quickly."  In the

6    email, PARKER represented to PSC that the Army had found

7    a new contractor to do the work, other than Contractor-

8    B-1, and that by going to this new company it would save

9    the Government money.  PARKER did not tell PSC that the

10    new company, Contractor-B-2, was also started by Co-

11    Conspirator-B, was 49% owned at the time by Co-

12    Conspirator-B's father, and also subcontracted out its

13    work to Contractor-B.

14  15. On or about October 12, 2018, PARKER received an email

15    that she did not get a job that she had applied for.

16    PARKER forwarded the email to an employee of Contractor-

17    B stating, "See email below.  No reason for you to come

18    out next week. May want to let [Individual-1] know that

19    when I leave the contracts are dead as there is no one

20    to take over as the COR. [Co-Conspirator-X] is to[o]

21    busy and SPAWAR is not going to let us keep doing what

22    we have been doing. Also with no funding I cannot work

23    on anything for the Army which means technically

24    everything should stop. I am going to have to let HHS

25    know next week.  Very bummed."  The employee of

26    Contractor-B forwarded the message to Co-Conspirator-X,

27    stating, "You indicated that you would be able to

28

Def. Initials ᴅP

1                                     continue to support us even if she leaves.  Let me know

2                                     your thoughts and if we can get together in San Diego

3                                     next week."

4      16.    In or about September or October 2019, Co-Conspirator-X

5                    contacted PARKER on behalf of Co-Conspirator-B.  Co-

6                    Conspirator-X told PARKER that Co-Conspirator-B wanted

7                    to use PARKER to help him start a new Native Hawaiian

8                    business to do Government contracting.  PARKER

9                    understood from the conversation with Co-Conspirator-X

10                  that the position offered by Co-Conspirator-B was a no-

11                  work position where she would simply be a figurehead.

12                                          **III**

13                                **PENALTIES**

14    The crime to which Defendant is pleading guilty carries the

15  following penalties:

16    A.    a maximum 5 years in prison;

17    B.    a maximum $250,000 fine;

18    C.    a mandatory special assessment of $100 per count; and

19    D.    a term of supervised release of up to 3 years.  Failure to

20                comply with any condition of supervised release may result in

21                revocation of supervised release, requiring Defendant to

22                serve in prison, upon revocation, all or part of the statutory

23                maximum term of supervised release.

24                                        **IV**

25             **DEFENDANT'S WAIVER OF TRIAL RIGHTS AND UNDERSTANDING OF CONSEQUENCES**

26    This guilty plea waives Defendant's right at trial to:

27

28

Def. Initials _____

1     A.    Continue to plead not guilty and require the Government to
2           prove the elements of the crime beyond a reasonable doubt;

3     B.    A speedy and public trial by jury;

4     C.    The assistance of counsel at all stages;

5     D.    Confront and cross-examine adverse witnesses;

6     E.    Testify and present evidence and to have witnesses testify on
7           behalf of Defendant;

8     F.    Not testify or have any adverse inferences drawn from the
9           failure to testify; and

10    G.    To assert now or on appeal, any legal, constitutional,
11          statutory, regulatory, and procedural rights and defenses
12          that she may have under any source of federal or common law,
13          including among others, challenges to personal jurisdiction,
14          extraterritoriality, statute of limitations, venue, and the
15          form and substance of the Information, including specifically
16          any claim of multiplicity, duplicity, or merger.

17     The defendant understands that, upon sentencing, the U.S.
18 Attorney's Office for the Southern District of California will report
19 her conviction to the Department of Justice's Bureau of Justice
20 Assistance pursuant to 10 U.S.C. § 2408 for inclusion in the Defense
21 Procurement Fraud Debarment Clearinghouse database and the System for
22 Award Management of the General Services Administration. The defendant
23 understands that 10 U.S.C. § 2408 provides for a mandatory term of
24 debarment of at least five years, which term may only be waived if the
25 Secretary of Defense determines a waiver is in the interests of national
26 security. The defendant understands that she also may be subject to
27 administrative action by other federal or state agencies, based upon
28

Def. Initials  DP

1 the conviction resulting from this Plea Agreement and upon grounds
2 other than 10 U.S.C. § 2408, and that this Plea Agreement in no way
3 controls whatever action, if any, other agencies may take. The
4 defendant nevertheless affirms that she wants to plead guilty
5 regardless of the debarment or administrative action consequences of
6 her plea. Therefore, the defendant waives any and all challenges to
7 her guilty plea and to her sentence based on the debarment or
8 administrative action consequences of her plea, and agrees not to seek
9 to withdraw her guilty plea, or to file a direct appeal or any kind of
10 collateral attack challenging her guilty plea, conviction, or sentence
11 based on such consequences of her guilty plea. However, the U.S.
12 Attorney's Office for the Southern District of California agrees that,
13 if requested, it will advise the appropriate officials of any
14 governmental agency considering such administrative action of the fact,
15 manner, and extent of any cooperation of the defendant as a matter for
16 that agency to consider before determining what administrative action,
17 if any, to take.
18
19                                    V
20        **DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE**
       **PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION**
21        Any information establishing the factual innocence of Defendant
22 known to the undersigned prosecutor in this case has been turned over
23 to Defendant  The Government will continue to provide such information
24 establishing the factual innocence of Defendant.
25        If this case proceeded to trial, the Government would be required
26 to provide impeachment information for its witnesses. In addition, if
27 Defendant raised an affirmative defense, the Government would be
28

                                   24

                                            Def. Initials  CP

1 required to provide information in its possession that supports such a

2 defense. By pleading guilty Defendant will not be provided this

3 information, if any, and Defendant waives any right to this information.

4 Defendant will not attempt to withdraw the guilty plea or to file a

5 collateral attack based on the existence of this information.

6

7

8                                      VI

9               **DEFENDANT'S REPRESENTATION THAT GUILTY**
                 <u>**PLEA IS KNOWING AND VOLUNTARY**</u>
10
       Defendant represents that:
11
12     A.    Defendant has had a full opportunity to discuss all the facts
             and circumstances of this case with defense counsel and has
13           a clear understanding of the charges and the consequences of
             this plea. By pleading guilty, Defendant may be giving up,
14           and rendered ineligible to receive, valuable government
             benefits and civic rights, such as the right to vote, the
15           right to possess a firearm, the right to hold office, and the
             right to serve on a jury. The conviction in this case may
16           subject Defendant to various collateral consequences,
             including but not limited to revocation of probation, parole,
17           or supervised release in another case; debarment from
             government contracting; and suspension or revocation of a
18           professional license, none of which can serve as grounds to
             withdraw Defendant's guilty plea.
19
       B.    No one has made any promises or offered any rewards in return
20           for this guilty plea, other than those contained in this
             agreement or otherwise disclosed to the Court.
21
       C.    No one has threatened Defendant or Defendant's family to
22           induce this guilty plea.

23     D.    Defendant is pleading guilty because Defendant is guilty and
             for no other reason.
24

25

26

27

28

                                              Def. Initials DP

1                                 **VII**

2      **AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF CALIFORNIA**

3      This plea agreement is limited to the United States Attorney's

4 Office for the Southern District of California, and cannot bind any

5 other authorities in any type of matter, although the United States

6 will bring this plea agreement to the attention of other authorities if

7 requested by Defendant.

8                                 **VIII**

9        **APPLICABILITY OF SENTENCING GUIDELINES**

10     The sentence imposed will be based on the factors set forth in 18

11 U.S.C. § 3553(a). In imposing the sentence, the sentencing judge must

12 consult the United States Sentencing Guidelines (Guidelines) and take

13 them into account. Defendant has discussed the Guidelines with defense

14 counsel and understands that the Guidelines are only advisory, not

15 mandatory. The Court may impose a sentence more severe or less severe

16 than otherwise applicable under the Guidelines, up to the maximum in

17 the statute of conviction. The sentence cannot be determined until a

18 presentence report is prepared by the U.S. Probation Office and defense

19 counsel and the Government have an opportunity to review and challenge

20 the presentence report. Nothing in this plea agreement limits the

21 Government's duty to provide complete and accurate facts to the district

22 court and the U.S. Probation Office.

23                                 **IX**

24     **SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE**

25     This plea agreement is made pursuant to Federal Rule of Criminal

26 Procedure 11(c)(1)(B). The sentence is within the sole discretion of

27 the sentencing judge who may impose the maximum sentence provided by

28

Def. Initials ___DP___

1 statute. It is uncertain at this time what Defendant's sentence will
2 be. The Government has not made and will not make any representation
3 about what sentence Defendant will receive. Any estimate of the probable
4 sentence by defense counsel is not a promise and is not binding on the
5 Court. Any recommendation by the Government at sentencing also is not
6 binding on the Court. If the sentencing judge does not follow any of
7 the parties' sentencing recommendations, Defendant will not withdraw
8 the plea.

9 X

10 **PARTIES' SENTENCING RECOMMENDATIONS**

11 A.   SENTENCING GUIDELINE CALCULATIONS

12 Although the Guidelines are only advisory and just one factor the
13 Court will consider under 18 U.S.C. § 3553(a) in imposing a sentence,
14 the parties will jointly recommend the following Base Offense Level,
15 Specific Offense Characteristics, Adjustments, and Departures:

16

17   1.   Base Offense Level [§ 2C1.1(a)(1)]                        14
     2.   More than One Bribe [§ 2C1.1(b)(1)]                      +2
     3.   Acceptance of Responsibility [§ 3E1.1]                   -3
18   4.   Reduction for Zero Point Offenders [§ 4C1.1]             -*

19 * If at the time of sentencing Defendant meets all of the elements of
20 USSG § 4C1.1(a), effective November 1, 2023, the United States will
   recommend an additional two-level downward adjustment.

21

22 B.   ACCEPTANCE OF RESPONSIBILITY

23 Despite paragraph A above, the Government need not recommend an
24 adjustment for Acceptance of Responsibility if Defendant engages in
25 conduct inconsistent with acceptance of responsibility including, but
26 not limited to, the following:

27   1.   Fails to truthfully admit a complete factual basis as
28        stated in the plea at the time the plea is entered, or

27

Def. Initials DP

1       falsely denies, or makes a statement inconsistent with,
2       the factual basis set forth in this agreement;
3       2.    Falsely denies prior criminal conduct or convictions;
4       3.    Is untruthful with the Government, the Court or
5       probation officer; or
6       4.    Breaches this plea agreement in any way.
7
8    C.    FURTHER ADJUSTMENTS AND SENTENCE REDUCTIONS INCLUDING THOSE
         UNDER 18 U.S.C. § 3553
9       Defendant may request or recommend additional downward
10  adjustments, departures, or variances from the Sentencing Guidelines
11  under 18 U.S.C. § 3553. The Government will oppose any downward
12  adjustments, departures, or variances not set forth in Section X,
13  paragraph A above.
14   D.    NO AGREEMENT AS TO CRIMINAL HISTORY CATEGORY
15      The parties have **no** agreement as to Defendant's Criminal History
16  Category.
17   E.    "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION
18      The facts in the "factual basis" paragraphs of this agreement are
19  true and may be considered as "relevant conduct" under USSG § 1B1.3 and
20  as the nature and circumstances of the offense under 18 U.S.C.
21  § 3553(a)(1).
22   F.    PARTIES' RECOMMENDATIONS REGARDING CUSTODY
23      The Government will recommend that Defendant be sentenced to the
24  low end of the advisory guideline range recommended by the Government
25  at sentencing.
26
27
28

Def. Initials

1      G.    SPECIAL ASSESSMENT/FINE/FORFEITURE

2            1.    Special Assessment

3      The parties will jointly recommend that Defendant pay a special

4 assessment in the amount of $100.00 to be paid forthwith at time of

5 sentencing  Special assessments shall be paid through the office of the

6 Clerk of the District Court by bank or cashier's check or money order

7 made payable to the "Clerk, United States District Court."

8            2.    Fine

9      The parties will not recommend imposition of a fine.

10           3.    Forfeiture

11     Defendant   consents   to   the   forfeiture   allegations   of   the

12 Information and agrees to the entry of a forfeiture money judgment

13 against her in the amount of $5,000.  The parties further agree that

14 the attached Forfeiture Addendum will govern Forfeiture in this matter.

15     H.    SUPERVISED RELEASE

16     If the Court imposes a term of supervised release, Defendant will

17 not seek to reduce or terminate early the term of supervised release

18 until Defendant has served at least 2/3 of the term of supervised

19 release and has fully paid and satisfied any special assessments, fine,

20 and criminal forfeiture judgment.

21                              XI

22     **DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK**

23     Defendant   waives   (gives up)   all   rights   to   appeal   and   to

24 collaterally attack every aspect of the conviction and sentence.  This

25 waiver includes, but is not limited to, any argument that the statute

26 of conviction or Defendant's prosecution is unconstitutional and any

27 argument that the facts of this case do not constitute the crime

28

29

Def. Initials ___

1  charged. The only exceptions are 1) Defendant may appeal a custodial
2  sentence above the high end of the guideline range recommended by the
3  Government at sentencing (if USSG § 5G1.1(b) applies, the high end of
4  the range will be the statutorily required mandatory minimum sentence),
5  and 2) Defendant may collaterally attack the conviction or sentence on
6  the basis that Defendant received ineffective assistance of counsel. If
7  Defendant appeals, the Government may support on appeal the sentence or
8  restitution order actually imposed.

9                                    **XII**

10                    **BREACH OF THE PLEA AGREEMENT**

11      Defendant and Defendant's attorney know the terms of this agreement
12  and shall raise, before the sentencing hearing is complete, any claim
13  that the Government has not complied with this agreement. Otherwise,
14  such claims shall be deemed waived (that is, deliberately not raised
15  despite awareness that the claim could be raised), cannot later be made
16  to any court, and if later made to a court, shall constitute a breach
17  of this agreement.

18      Defendant breaches this agreement if Defendant violates or fails
19  to perform any obligation under this agreement. The following are non-
20  exhaustive examples of acts constituting a breach:

21          1.   Failing to plead guilty pursuant to this agreement;
22          2.   Failing to fully accept responsibility as established in
23               Section X, paragraph B, above;
24          3.   Failing to appear in court;
25          4.   Attempting to withdraw the plea;
26          5.   Failing to abide by any court order related to this case;
27
28

                                30

1    6.    Appealing (which occurs if a notice of appeal is filed)
2          or collaterally attacking the conviction or sentence in
3          violation of Section XI of this plea agreement; or
4    7.    Engaging in additional criminal conduct from the time of
5          arrest until the time of sentencing.

6    If Defendant breaches this plea agreement, Defendant will not be
7 able to enforce any provisions, and the Government will be relieved of
8 all its obligations under this plea agreement. For example, the
9 Government may proceed to sentencing but recommend a different sentence
10 than what it agreed to recommend above. Or the Government may pursue
11 any charges including those that were dismissed, promised to be
12 dismissed, or not filed as a result of this agreement (Defendant agrees
13 that any statute of limitations relating to such charges is tolled
14 indefinitely as of the date all parties have signed this agreement;
15 Defendant also waives any double jeopardy defense to such charges). In
16 addition, the Government may move to set aside Defendant's guilty plea.
17 Defendant may not withdraw the guilty plea based on the Government's
18 pursuit of remedies for Defendant's breach.

19    Additionally, if Defendant breaches this plea agreement: (i) any
20 statements made by Defendant, under oath, at the guilty plea hearing
21 (before either a Magistrate Judge or a District Judge); (ii) the factual
22 basis statement in Section II.B in this agreement; and (iii) any
23 evidence derived from such statements, are admissible against Defendant
24 in any prosecution of, or any action against, Defendant. This includes
25 the prosecution of the charge(s) that is the subject of this plea
26 agreement or any charge(s) that the prosecution agreed to dismiss or
27 not file as part of this agreement, but later pursues because of a
28

31

Def. Initials

1  breach   by   the   Defendant.   Additionally,   Defendant   knowingly,

2  voluntarily, and intelligently waives any argument that the statements

3  and any evidence derived from the statements should be suppressed,

4  cannot be used by the Government, or are inadmissible under the United

5  States Constitution, any statute, Rule 410 of the Federal Rules of

6  Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, and

7  any other federal rule.

8

9                                      **XIII**

10                 **CONTENTS AND MODIFICATION OF AGREEMENT**

11       This  plea  agreement  embodies  the  entire  agreement  between  the

12  parties  and  supersedes  any  other  agreement,  written  or  oral.   No

13  modification of this plea agreement shall be effective unless in writing

14  signed by all parties.

15                                      **XIV**

16         **DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT**

17       By signing this agreement, Defendant certifies that Defendant has

18  read it (or that it has been read to Defendant in Defendant's native

19  language). Defendant has discussed the terms of this agreement with

20  defense counsel and fully understands its meaning and effect.

21

22

23

24

25

26

27

28

Def. Initials  DP

1                                         XV

2             <u>DEFENDANT SATISFIED WITH COUNSEL</u>

3        Defendant has consulted with counsel and is satisfied with

4  counsel's representation. This is Defendant's independent opinion, and

5  Defendant's counsel did not advise Defendant about what to say in this

6  regard.

7

8                                    TARA K. MCGRATH
                                      United States Attorney

9

10  <u>10/24/23</u>
    DATED                         MICHELLE L. WASSERMAN
11                               Assistant U.S. Attorney

12  <u>10/23/23</u>
    DATED
13                               DAVID BAKER
                                   Defense Counsel

14  IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER
    PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" SECTION ABOVE
15  ARE TRUE.

16

17  <u>10/23/2023</u>
    DATED                         DAWNELL PARKER
18                               Defendant

19

20

21

22

23

24

25

26

27

28

Def. Initials DP

**FILED**

OCT 2 6 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1   **United States v. Dawnell PARKER, Case No.** 23-cr-02192-TWR

2   **FORFEITURE ADDENDUM**

3   Defendant's conviction will include forfeiture. This forfeiture
4   addendum is incorporated into and part of Defendant's plea agreement,
5   and the additional terms and warnings below apply.

6   A.   <u>Penalty</u>.

7   In addition to the penalties in the plea agreement, federal law
8   states that the Defendant must forfeit to the United States any property,
9   real and personal, which constitutes or is derived from proceeds
10  traceable to the violation to which she is pleading guilty, to wit,
11  conspiracy to commit bribery of a public official.

12  B.   <u>Property Subject to Forfeiture</u>.  In addition to pleading
13  guilty to the Information, as set forth in Section I of the main
14  agreement, Defendant consents to the forfeiture allegations of the
15  Information and agrees to forfeit, via entry of a personal money judgment
16  against Defendant, the amount of $5000, which shall be included in the
17  judgment in this case.

18  C.   <u>Bases of Forfeiture</u>.  Defendant acknowledges that the
19  forfeiture in the amount of $5,000 against her represents the moneys she
20  personally received from the offense and is subject to forfeiture to the
21  United States as proceeds of illegal conduct in violation of Title 18,
22  United States Code, Sections 201 and 371, and subject to forfeiture to
23  the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §
24  2461(c).

25  D.   <u>Immediate Entry of an Order of Forfeiture</u>. Defendant consents
26  and agrees to the immediate entry of an order of forfeiture upon entry
27  of the guilty plea. Defendant further agrees that upon entry of the
28  order of forfeiture, such order will be considered final as to defendant.

Defendant agrees to immediately withdraw any claims to property directly or indirectly related to the criminal conduct seized in connection with this case in any pending administrative and civil forfeiture proceeding, and consents to the forfeiture of all properties seized in connection with this case to the United States. Defendant agrees to execute any and all documents requested by the Government to facilitate or complete the forfeiture process. Defendant further agrees not to contest or to assist any other person or entity in contesting the forfeiture of the property seized in connection with this case. Contesting or assisting others in contesting the forfeiture shall constitute a material breach of the plea agreement, relieving the Government of all its obligations under the agreement including but not limited to its agreement to recommend an adjustment for Acceptance of Responsibility. Defendant further agrees that the forfeiture judgment imposed by the Court will be (i) subject to immediate enforcement, and (ii) submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the Defendant receives may be offset and applied to the outstanding balance on the forfeiture judgement. Defendant waives all notices with respect to the Treasury Offset Program and waives all rights to contest any and all offsets. Defendant waives all demand for payment of the forfeiture judgment and waives all notices for substitution of property to collect the full amount of the judgment.

E. <u>Entry of Orders of Forfeiture and Waiver of Notice</u>. Defendant consents and agrees to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges

Def. Initials

1 that defendant understands that the forfeiture of assets is part of the
2 sentence that may be imposed in this case and waives any failure by the
3 Court to advise defendant of this, pursuant to Rule 11(b)(1)(J), at the
4 time the Court accepts the guilty plea.

5    F.   Waiver of Constitutional and Statutory Challenges.  Defendant
6 further agrees to waive all constitutional and statutory challenges in
7 any manner (including direct appeal, habeas corpus, or any other means)
8 to any forfeiture carried out in accordance with this agreement on any
9 grounds, including that the forfeiture constitutes an excessive fine or
10 punishment.  Defendant agrees to take all steps as requested by the
11 United States to pass clear title to forfeitable assets to the United
12 States, and to testify truthfully in any judicial forfeiture proceeding.

13    G.   Agreement Survives Defendant; No Forfeiture Abatement.
14 Defendant agrees that the forfeiture provisions of this plea agreement
15 are intended to, and will, survive defendant, notwithstanding the
16 abatement of any underlying criminal conviction after the execution of
17 this agreement.  The forfeitability of any particular property pursuant
18 to this agreement shall be determined as if defendant had survived, and
19 that determination shall be binding upon defendant's heirs, successors
20 and assigns until the agreed forfeiture, including any agreed money
21 judgment amount, is collected in full.

22    H.   Substitute Assets/Collection of Forfeiture.  Defendant
23 acknowledges and agrees that the forfeiture in this case includes entry
24 of a personal money judgment against Defendant, and that interest shall
25 accrue on the judgment from the date of entry of the Order of Forfeiture
26 in accordance with 18 U.S.C. § 3612(f) and 28 U.S.C. § 1961.  The
27 Defendant agrees that the United States may take all actions available
28 to it to collect the full amount of the judgment, including enforcement

3                                    Def. Initials ⟨initials⟩

1  of the judgment against substitute assets as provided in 21 U.S.C.

2  § 853(p) and actions available under the Federal Debt Collections

3  Procedure Act. Defendant further agrees that the judgment may be

4  executed against property wherever it is held and it waives all rights

5  to contest the enforcement of the judgment. Defendant consents to the

6  entry of the forfeiture judgment into the Treasury Offset Program and

7  waives all notices of the Treasury Offset Program and all notices of

8  offset.

9       The defendant understands that the main plea agreement and this

10  addendum embody the entire plea agreement between the parties and

11  supersedes any other plea agreement, written or oral.

13  __10/23/2023__
    Date

    DAWNELL PARKER
    Defendant

15  Acknowledgement by Counsel:

17  __10/23/23__
    Date

    DAVID BAKER
    Defense Counsel

20  __10/24/23__
    Date

    MICHELLE L. WASSERMAN
    Assistant U.S. Attorney

4

Def. Initials ___